# Dutton *versus* Pailaret *et al.*

The condition of a bond for payment of $3000 " in gold coins of United States of a particular fineness, notwithstanding any law which may now or hereafter shall make anything else a tender in payment of debt," *Held*, not payable in greenbacks.

ERROR to the District Court of *Philadelphia*.

This was a *scire facias sur mortgage*, issued December 2d 1865, by John G. Pailaret, Richard T. Pailaret and John G. Booty, assignees of William L. Schaffer, against William R. Dutton. The mortgage was dated August 7th 1862, and recited that Dutton, by his obligation of the same date, was bound to Schaffer " in the sum of $6000 lawful money of the United States of America, conditioned for the payment in three years of the just sum of $3000 in gold coin of the United States aforesaid, of the present standard of weight and fineness, notwithstanding any law which now may or hereafter shall make anything else a tender in payment of debts."

The proviso of defeasance was, " that if the mortgagor * shall cause to be paid * the aforesaid debt or principal sum of $3000 in gold coin; such as aforesaid * * *"

On the 7th of August 1865, the day the debt secured by the

mortgage was payable, the rate at which gold was sold was 144 per cent.

The plaintiffs' point in the court below was, that they were entitled to recover the principal and interest " in lawful money of the United States, to be calculated according to the market rate of premium for gold at the time of the breach of the contract, that is to say, at the rate of $144 in lawful money for every $100 in gold."

The defendant's points were:—

" 1. That plaintiffs are entitled to a verdict for the amount of the mortgage, with the interest due thereon, without regard to the value of the gold coin at the time the mortgage became due.

" 2. That plaintiffs are entitled to a verdict for the amount of the mortgage, and interest, without regard to the currency in which the same is made payable.

" 3. That plaintiffs are entitled to a verdict for the amount of the debt, and interest, in dollars of the United States, without regard to the designation of coinage or kind."

The court below (Hare, J.) affirmed the plaintiffs' point, and negatived the defendant's points, and the plaintiffs had a verdict for $4430.16.

The errors assigned were the answers of the court to the several points.

*C. T. Bonsall* and *D. W. Sellers,* for plaintiffs in error, referred to the Act of Congress of July 11th 1862; Judge Hare's opinion in Shoenberger *v.* Watts, 19 Leg. Intel. 244; and generally to the " Legal Tender Cases," reported in the preceding pages of this volume.

*W. H. Rawle* and *H. Wharton,* for defendants in error.—The suit is for the *penalty,* there being a failure to perform the condition; the obligor is to be compensated to the extent of the penalty if necessary: Co. L. 206 a; Com. Dig. *Condition,* D. 1; Laughter's Case, 5 Rep. 21; Sloman *v.* Walker, 1 Bro. C. C. 418; Errington *v.* Aynesly, 2 Id. 341; Skinner *v.* Dayton, 2 Johns. Ch. 535; Rann *v.* Hughes, 7 Bro. P. C. 550; 2 Kent Com. 464*; 1 Pars. Cont. 429, 5th ed.; Mather *v.* Kinike, 1 P. F. Smith 425.

*E. K. Price, C. T. Bonsall* and *D. W. Sellers,* in reply.

The opinion of the court was delivered, May 13th 1867, by

WOODWARD, C. J.—The argument of the learned counsel for defendant in error, that the only *debt* in this case, to which the Acts of Congress making treasury notes legal tenders can be applied, is in the penalty of the bond recited in the mortgage, is

[Dutton *v.* Pailaret.]

too artificial for practical use. Bonds and mortgages are usually taken, as these were, in a penal sum that is double the real debt, and what proves the greater sum to be a mere penalty, is, that it is always discharged by paying the real debt. No matter that this result is accomplished by the interposition of equity to relieve against a forfeiture at law, the effect is to make the *condition* of the bond and mortgage rather than the *penal sum*, the debt between the parties, and as the Acts of Congress apply themselves to all private debts, such conditions of penal instruments are subject to the acts, if not taken out of them by special provisions.

Still, it is worthy of notice as matter of construction, that the penal sum fixed between these parties was payable in "lawful money of the United States," while the real debt was payable in gold coin of the United States of a particular weight and fineness, which might be or might not be lawful money. According to the terms of the contract the penalty, if it became payable at all, could be paid in anything which the law-making power of the country had declared, or should thereafter declare, to be a legal tender, but the principal debt was to be payable only in specific coins, whatever legislation might take place. Herein the parties strikingly contrasted the different measures of value they meant should be applied to the penalty and to the real debt.

But notwithstanding the terms of their contract, it is argued that this was a *specie* contract, like that in Graham *v.* Marshall, and, like the debt due in that case, payable in greenbacks. It is to be observed that the word " specie," in the corner of the note in question in Graham *v.* Marshall, was the only word that tended to distinguish that from ordinary contracts for lawful money, and that word was explained by parol proof of bankers to mean gold or silver currency of the United States, which was the only legal tender at the time of the contract. The doctrine of that case is, then, that a contract which stipulated for gold and silver currency of the United States before the Act of Congress making paper money a legal tender, was nevertheless payable in paper money after the Act was passed. The legislative power of Congress, assuming it to have a constitutional foundation, was held sufficient to substitute one form of current money for another form of current money in payment of a private debt. It is not my purpose at present to enter into any vindication of that doctrine, though I know it has been extensively doubted, but I may be allowed to say, in passing, that it seems to be forgotten that every contract which existed in the United States for the payment of money on the 26th February 1862, was a " *specie*" contract, that is, solvable in nothing but gold or silver currency of the United States (except by consent of the creditor), because nothing else was a legal tender in payment of debts at that date. The contract in

[Dutton *v.* Pailaret.]

Graham *v.* Marshall only expressed what was the common law of all other money contracts. If the Act of Congress were not applicable to it, by parity of reason it would be applicable to no other money contracts. In other words, it was a dead letter in respect of all existing contracts, though the constitutional power to enact it was successfully asserted. Whoever, therefore, quarrels with the application of the Act to that particular contract is bound to deny its applicability to all contracts existing at its date, for the payment of lawful money, and that would bring the objector to the very ground on which my brother Thompson and myself struggled, unsuccessfully, to resist the operation of the Act. We denied the power of Congress to change existing contracts, however they might prescribe a rule for future ones; but the power having been sustained we cannot distinguish between contracts that are all made on the same specie basis, and say some shall be payable only in specie, and others may be paid in greenbacks. If the power is constitutional, the Act applies it to *all* private debts.

But here we have a contract that was made after the Act of 1862 was passed, and the stipulation was for " $3000 in gold coin of the United States aforesaid, of the present standard weight and fineness, notwithstanding any law which now may or hereafter shall make anything else a tender in payment of debt." If the contract had stopped at the word " dollars," the legal currency of the country would have been intended, and any kind of dollars which the sovereign power had declared a legal tender would have sufficed to pay the debt, but the parties did not stop there, but went on to prescribe the dollar for themselves. They said it should be gold, coined by the United States, and should consist of as many pennyweights and grains as the present standard of the government requires, whatever changes of standard the government might thereafter make. It was a contract for gold coins to be measured by a fixed, certain and well known standard, which was expressly distinguished from any other standard the government might set up. Currency or current money, or lawful money, were not once mentioned or alluded to in the efficient part of the contract. How then can we treat this as a specie contract payable in the current money of the government? The gold coins might or might not be current money. The contract did not base itself on that, but on coins of a specific value. Like the contract in Mather *v.* Kinike, 1 P. F. Smith 425, which was for coined silver, this was a contract not for governmental currency, but for a specific article; as specific as if it had been for wheat at so many pounds per bushel, or for a horse of certain qualities.

The reference to the governmental standard was only a convenient mode of fixing the agreed fineness of the coins. And the selection of American coins instead of Spanish, as in Mather *v.*

[Dutton v. Pailaret.]

Kinike, is a circumstance of no importance. The contracts in both cases were essentially the same, and both are plainly distinguishable from the contract in Graham v. Marshall. There the ordinary legal tenders of the country were stipulated for—here they were expressly excluded, unless they should happen to correspond with the standard adopted by the parties as a law unto themselves. The possibility of such an accidental correspondence cannot control the construction of the contract, for contracts that are lawful must be administered as the parties have made them. *Modus et conventio vincunt legem.*

But it is argued that the contract in this case was in derogation of the policy of Congress. Undoubtedly it was. But what of it? Congress has not denied to parties the capacity to contract for specific articles. All barters are not abolished by law. When parties contract expressly or impliedly for lawful money, they mean such money as the government makes lawful for the time being. Here the policy of Congress has scope and verge enough, for it can substitute a depreciated paper currency for gold and silver. But when parties stipulate for specific chattels and expressly exclude the legal tenders which government has prescribed, the bargain must be presumed to rest upon an adequate consideration, and neither legislative nor judicial power can pluck the fruits that belong to one of the parties, for the mere purpose of giving them to the other.　　　　The judgment is affirmed.